UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/20/2022
```

-------------------------------------------------------------------X
:
:
ARMIN DE GOORTE f/k/a OSAMA AHMED          :
ABDELLATIF EL MOKADEM,                      :
:                    19-cr-646 (LJL)
                                Petitioner.  :                    22-cv-1303 (LJL)
:
            -v-                              :                 OPINION AND ORDER
:
UNITED STATES,                              :
:
                                Respondent.  :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Petitioner Armin De Goorte ("Petitioner" or "De Goorte") moves for an order, pursuant

to 28 U.S.C. § 2255 and the Fourteenth Amendment, vacating his judgment of conviction entered

following his plea of guilty to two counts of bank fraud and two counts of wire fraud.  Dkt. No.

111.

        De Goorte claims that, as an Egyptian national who had been in the United States for

almost fifteen years at the time of his guilty plea and who is now married to a United States

citizen, he would not have pleaded guilty had he understood that the consequences of his guilty

plea were that he would be subject to mandatory deportation.  Dkt. No. 109.  He claims that his

agreement to plead guilty was the product of unreasonable and constitutionally ineffective advice

provided by his trial counsel, James Schiff.  *Id.*

        The Court summarizes the relevant facts from the criminal proceeding, from the

affidavits and declarations submitted in support of and in opposition to De Goorte's Section 2255

motion, and from the evidentiary hearing on the motion conducted on September 13, 2022.  It

then states its conclusions of law.

For the reasons that follow, De Goorte's Section 2255 motion is denied.

## BACKGROUND

### I.  The Criminal Proceeding

On August 6, 2019, De Goorte was arrested pursuant to a complaint charging him with wire fraud, in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  Dkt. Nos. 1, 2. The complaint supporting the arrest warrant charged De Goorte with two fraudulent schemes. Dkt. No. 1.  The first scheme lasted from approximately 2015 to 2018.  De Goorte formed a New York charitable entity called United Nations Care Inc. which was subsequently renamed Nations Care Inc. (the "Entity").  *Id.* at ¶¶ 7–9.  The Entity bore no relationship to the similarly named United Nations entity "U.N. Cares" and did not make any expenditures on international aid programs for children or engage in any charitable mission.  *Id.* ¶ 8.  Then, from October 2016 to September 2018, fraudulent charges were made to the credit cards of seven different individuals without their consent.  *Id.* ¶¶ 11–14.  In each instance, after the credit card charge reached the Entity's account, the money was transferred to an account in the name of "Armin De Goorte." *Id.*  When a card processor conducted a review of the Entity's transactions with two of the victims, the Entity provided false documents purporting to show that the victim had pledged funds to help the United Nations or to purchase a table at the UN Day Humanitarian Awards Dinner.  *Id.* ¶ 13.  The second scheme involved bank fraud and occurred in January and March 2019.  In January 2019, De Goorte exchanged and passed a $3 million check that he knew to be worthless and in March 2019, he exchanged and passed a $6 million check he knew to be worthless.  *Id.* ¶¶ 15–16.

Because De Goorte was financially unable to employ counsel, he was originally represented by Philip Weinstein, Esq., of the Federal Defenders of New York, Inc.  Dkt. No. 4.

He was presented on August 6, 2019 and was released, with stand-alone GPS monitoring, on a $75,000 personal recognizance bond to be consigned by two financially responsible persons. Dkt. No. 5.

On August 9, 2019, De Goorte retained attorney James Schiff to represent him in the case. Dkt. No. 14.

On September 4, 2019, a grand jury indicted De Goorte on charges of wire fraud in violation of 18 U.S.C. § 1343, aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), 1028(b), and two counts of bank fraud in violation of 18 U.S.C. § 1344. Dkt. No. 11. The indictment tracked the allegations in the Complaint. De Goorte was arraigned on September 12, 2019, and the Court set a trial date of March 30, 2020.

On October 21, 2019, De Goorte requested a modification of the conditions of his bail to remove the condition requiring GPS monitoring. Dkt. No. 19. Counsel argued that the location monitoring device presented a hindrance to De Goorte's day-to-day life and ability to conduct business and that while he was an Egyptian national, he did not pose a risk of flight. Dkt. No. 21. The Government opposed the motion. Dkt. No. 22. It stated that De Goorte was an Egyptian citizen present in the United States without lawful status and that "[a]ccordingly, if he is convicted, it is likely that he would be removed from the United States following his sentence" and that De Goorte had "a rational incentive to flee now rather than face a carceral sentence followed by removal." *Id.* at 1. It also noted that De Goorte had "no significant ties to the community, such as family in the United States, property owned here, or a lengthy history of legitimate employment," *id.*, and that, after the court ordered that De Goorte post a $75,000 bond co-signed by two financially responsible persons as a condition of his bail, De Goorte was unable

3

to identify a single financially responsible person as a co-signer and only one person of moral suasion agreed to sign the bond—a friend of four to five years.  *Id.* at 2.

During the hearing on the application to modify De Goorte's bail conditions on October 31, 2019, De Goorte's then-counsel Schiff stated that De Goorte was consulting with an immigration attorney to clarify whether he was in the United States illegally.  Dkt. No. 24 at 5:11–12.  In De Goorte's presence, however, Schiff agreed with the Court's statement that it was "fair to say . . . that if convicted of this offense, [De Goorte] faces potential deportation."  *Id.* at 6:2–4.  The Government asserted that De Goorte was present in the United States unlawfully but argued that, regardless of his legal status, "certainly deportation is not only possible but very likely or all but certain if this case ends in a conviction for some of these charges, so that's certainly an incentive to flee."  *Id.* at 10:12–15.  The Court denied the application for bail, stating that "upon felony conviction, there is certainly the possibility of deportation."  *Id.* at 16:4–5.  The Court also found that "there is an absence of substantial ties to the community demonstrated on this record."  *Id.* at 16:7–8.

On January 16, 2020, the Government obtained a superseding indictment, adding an additional count of bank fraud.  Dkt. No. 26.  It charged that on or about October 2019, after De Goorte had been arrested, he committed the crime of wire fraud by falsely representing that he had prepaid the balance of a business credit card in order to convince the card provider to extend him credit to which he was not entitled.  *Id.* at 4–5.

The Government wrote to the Court on January 21, 2020, asking the Court to schedule an arraignment on the superseding indictment and alerting the Court that it intended to address De Goorte's bail status at the time of arraignment.  Dkt. No. 27.

De Goorte was arraigned on the superseding indictment on January 30, 2020. The Government moved to revoke De Goorte's bail. In its argument in support of revoking bail for De Goorte, the Government stated: "I know there is a substantial amount of debate about the defendant's immigration status or regardless of whether or not he is currently in immigration status, following a federal felony conviction, it would be very likely that he would be removed from the United States following some period of incarceration." Dkt. No. 34 at 13:9–14.

De Goorte pleaded guilty on February 13, 2020 to Counts One, Three, Four, and Five of the superseding indictment charging him with two counts of wire fraud and two counts of bank fraud. He did not plead guilty to the charge of aggravated identity theft. De Goorte did so pursuant to a plea agreement that provided that the Government would agree to dismiss Count Two of the indictment, which charged him with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and carries a mandatory consecutive two-year sentence. Dkt. No. 109-10. The Government and De Goorte also agreed to a stipulated sentencing guidelines range that gave De Goorte a three-level reduction of acceptance of responsibility. Thus, the stipulated sentencing guidelines range was 63 to 78 months imprisonment. *Id.* at 3. Had De Goorte rejected the offer, stood trial, and been convicted of every count in the superseding indictment, his sentencing guidelines range for Counts One, Three, Four, and Five would have been 87 to 108 months imprisonment and he would have faced a mandatory two-year consecutive sentence for Count Two. Presentence Report ¶ 100.

The plea agreement also contained this language with respect to the immigration consequences of De Goorte's conviction:

> The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his removal from the United States is presumptively mandatory and that, at a minimum, he is at risk of being removed or suffering other adverse immigration consequences. . . . The defendant affirms that

he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

Dkt. No. 109-10 at 5.

During the plea proceeding, the Court engaged in colloquy with De Goorte regarding the immigration consequences of his plea as follows:

THE COURT: Okay. And, Mr. De Groote [sic], are you a United States citizen?

THE DEFENDANT: I'm sorry?

THE COURT: Are you a United States citizen?

THE DEFENDANT: No.

THE COURT: Okay. You understand that as a result of your guilty plea, there may be adverse effects on your immigration status, including further detention following completion of your sentence and removal or deportation from the United States? Do you understand that?

THE DEFENDANT: I understand.

THE COURT: And we're going to talk more about your plea agreement in a moment, but just on this point, as it indicates in your plea agreement, your guilty plea and conviction make it very likely that your removal from the United States is presumptively mandatory and that, at a minimum, you're at risk of being removed or suffering other adverse immigration consequences. Do you understand that?

THE DEFENDANT: Understand.

THE COURT: Okay. Have you had an opportunity to discuss the potential immigration consequences of your plea with your lawyer?

THE DEFENDANT: Yes.

Dkt. No. 36 at 14:6–15:2.  Later in the proceeding, the Court engaged in the following colloquy:

> THE COURT: [. . .] The last point I wanted to focus on from the plea agreement, Mr. De[]Goorte, back to our discussion of the potential immigration consequences. On page 5 of the plea agreement, it talks about what we discussed with regard to that.  It also states that you agree you will have no right to withdraw your guilty plea based on any actual or perceived adverse immigration consequences, including removal or denaturalization, resulting from the guilty plea and conviction.  Do you understand that?

> THE DEFENDANT: Understand.

> THE COURT: And it's further agreed that you'll not challenge your conviction or sentence on direct appeal or through other litigation on the basis of any actual or perceived adverse immigration consequences, including removal or denaturalization resulting from your guilty plea and conviction; do you understand that?

> THE DEFENDANT: Understand.

*Id.* at 21:20–22:11.  The Court set sentencing for April 1, 2020.  *Id.* at 31:11–12.  Sentencing was postponed for several months due to the coronavirus pandemic.  On June 23, 2020, the Court released De Goorte from custody finding clear and convincing evidence that he no longer posed a flight risk or a danger to the community.

On March 1, 2021, De Goorte was sentenced by video conference.  In his sentencing memorandum, De Goorte's then-counsel Schiff urged the Court to impose a sentence of time served followed by post-release supervision.  Dkt. No. 42 at 1.  At sentencing, Schiff argued that the harsh conditions De Goorte had to endure for the five months he was in pretrial detention at the Metropolitan Correctional Center ("MCC") provided adequate punishment and deterrence for his crime.  Dkt. No. 97 at 23:17–26:15.  De Goorte addressed the Court, making the point that being in detention was "the worst experience of my life ever" and that it was "horrific."  *Id.* at 34:10–11.  Schiff did not mention De Goorte's immigration status or that as a result of his plea he was mandatorily removable from the United States.

The Court sentenced De Goorte to 24 months in prison to be followed by three years of supervised release, and De Goorte was ordered to surrender on June 1, 2021.  *Id.* at 40:13–16, 46:22–25.  The Court stated:

> Because the defendant has repeatedly engaged in a pattern of fraudulent conduct, and he did so even while on supervision pending trial, I have no doubt that a substantial sentence is necessary to reflect the seriousness of the offense, to generally deter and specifically deter, and to promote respect for the law.
>
> The proposed sentence of time served would be insufficient in the Court's view to meet these critical purposes.  And although the types of crimes that are at issue here may not often lead to recidivism as the studies submitted by the defendant suggest, I am convinced that in this case, only a clear and real and substantial sentence will sufficiently deter the defendant from engaging in this illegal and fraudulent conduct again.

*Id.* at 38:2–15.  On May 11, 2021, Schiff filed a letter under seal requesting a three-month extension of the surrender date because De Goorte was "working with an immigration attorney to attain citizenship."  The Court granted the request, adjourning De Goorte's surrender to September 1, 2021.  In early June 2021, De Goorte received his Bureau of Prisons designation to North Lake CI.  Dkt. No. 109 at 15.

On August 19, 2021, Schiff wrote the Court, again under seal, requesting another adjournment of the surrender date.  Dkt. No. 109-17.  Counsel stated as follows:

> As the Court is aware, the defendant is currently working with an immigration attorney to attain citizenship and has an immigration interview scheduled for August 25, 2021.  Additionally, U.S. Citizenship and Immigration Services granted the defendant's application for employment authorization. . . .  Mr. De Goorte and his wife, Heather Dickerson are working hard and making progress towards citizenship.

*Id.* at 2.  The Court granted an additional one-month adjournment, setting a new surrender date of October 1, 2021.  On September 15, 2021, De Goorte wrote a letter to the Court requesting the appointment of counsel and an additional adjournment to his surrender date.  Dkt. No. 96.  On September 20, 2021, the Court appointed the Federal Defenders of New York to represent

De Goorte and denied the request to adjourn the surrender date with leave for application to be made by defense counsel.  Dkt. No. 92.  Following a request from newly appointed defense counsel, the Court granted a two-month adjournment of De Goorte's October 1, 2021 surrender date.  Dkt. No. 95.  On November 17, 2021, defense counsel submitted a request for a four-month adjournment of the December 1, 2021 voluntary surrender date to April 1, 2021, which the Court granted.  Dkt. Nos. 101, 102.  Following another request from defense counsel, the Court extended the surrender date to June 1, 2022, Dkt. No. 114, and then again to September 20, 2022, Dkt. No. 124.  Following an evidentiary hearing on the Section 2255 motion, the Court again extended De Goorte's surrender date to September 27, 2022.

## II.    The De Goorte Declaration

De Goorte has submitted a declaration in support of his Section 2255 motion.  Dkt. No. 109-1.  De Goorte recounts that in 2019 (after he was arrested in this case) he met a woman named Heather Dickerson whom he married in July 2020, after he had pleaded guilty and while he was awaiting sentencing.  *Id.* ¶¶ 4–5.  In August 2020, De Goorte and Dickerson retained an immigration attorney to apply for a green card for him.  *Id.* ¶ 16.  On October 30, 2020, De Goorte and his wife—with the assistance of counsel—filed three applications with the United States Customs and Immigration Service ("CIS"): an I-130 application for De Goorte to obtain status as a lawful permanent resident based on his marriage to Ms. Dickerson, an I-795 application for employment authorization, and an I-485 application for permanent residency.  *Id.* ¶ 17.  For the filing of those applications and the assistance of counsel in connection with them, De Goorte and Dickerson spent $11,860 in attorney's fees and filing fees between August 12, 2020 and October 29, 2021.  *Id.* ¶ 18.

In June 2021, De Goorte learned that he had been designated to serve his sentence at North Lake, CI, a private facility operated by the GEO Group that is reserved for non-citizens

convicted of federal crimes.  *Id.* ¶ 22.  De Goorte discussed the designation with his immigration attorney, who informed him that he would automatically be deported from the United States back to Egypt after serving the remainder of his term of imprisonment.  *Id.*

De Goorte claims that he was "stunned and very upset" to learn that he would be deported, *id.*, and that he would never have entered his guilty plea had he been told that the plea would require his deportation, *id.* ¶ 26.  De Goorte states that he told his previous lawyer, Schiff, "from the beginning that [he] wanted to remain in the United States and did not want to do anything in this case that would jeopardize that goal."  *Id.* ¶ 5.  He also states that the immigration consequences of a plea or conviction were of "utmost importance" to him as he considered whether to enter a guilty plea as he had lived in the United States for 15 years and was in a serious relationship with Dickerson with whom he was planning to spend the rest of his life.  *Id.* ¶ 9.  He states that when he reviewed the plea agreement and saw the section regarding immigration, he did not understand it and spoke to Schiff about it.  *Id.* ¶ 10.  According to De Goorte, Schiff told him that the "language on immigration was standard and was included in every plea agreement."  *Id.*  From that discussion, he did not understand that removal from the United States was guaranteed.  *Id.*  He asserts that Schiff never suggested that De Goorte consult with an immigration attorney before entering into the plea agreement.  *Id.*  De Goorte states that Schiff told him that "New York was a 'liberal' state, and that Governor Cuomo was fighting the Trump administration to protect immigrants, so I should not worry about being deported from here, regardless of what the plea agreement said about immigration."  *Id.* ¶ 11.  De Goorte avers that Schiff previously told him that "the fastest way for me to get home, and back to Heather, would be to accept the offer."  *Id.* ¶ 8.

De Goorte further states that before he and Schiff went to Court for De Goorte to plead guilty, Schiff told him that the judge would repeat "the same things" about immigration that were written in the plea letter and that the warnings were "just a formality, given in every single plea hearing." *Id.* ¶ 12.  De Goorte states that when the Court stated during the guilty plea proceedings that his removal would be "presumptively mandatory," he did not understand that language to mean anything different from what he had been told by Schiff: "that I did not actually have to worry about being deported." *Id.* ¶ 13.  He states that Schiff advised him and Dickerson to work with an immigration attorney to pursue his efforts to obtain lawful status in the United States and to make as much progress as possible prior to sentencing. *Id.* ¶ 15.

De Goorte recites the money he spent on legal fees and application fees, *id.* ¶ 18, and the time he spent on the CIS applications which required him to obtain approval from the Court to leave his home and meet with counsel, *id.* ¶ 19.  He also notes that neither his lawyer nor the Court made any reference to the immigration consequences of his guilty plea at the time of his sentencing. *Id.* ¶ 20.

De Goorte concludes:

> I want to remain in the United States.  If James Schiff had told me that the plea I entered would require my deportation, I would have pushed him to negotiate a plea that did not ruin my chances of staying here.  If we could not have gotten a better plea deal, I would have gone to trial. *Id.* ¶ 26.

De Goorte also states that at no point in his representation by Schiff was he offered an Arabic language interpreter, *id.* ¶ 6, and that when he asked during the plea negotiations about the possibility of going to trial, Schiff told him that it would cost another $25,000, *id.* ¶ 8.  De Goorte also claims that when he asked about going to trial with a public defender, Schiff told him that he was representing De Goorte better than a public defender would.  *Id.*

III.    **The Dickerson Declaration**

The defense also has submitted a declaration from Dickerson, De Goorte's wife.  Dkt.

No. 109-3.  Dickerson is a United States citizen who was born in Nashville, Tennessee in 1981.

She works in sales and marketing in the beauty and retail industries for employers located in the

United States.  *Id.* ¶¶ 2–3.  She does not speak any languages other than English and her family

and friends live in the United States.  *Id.* ¶ 2.  She recounts that she first met De Goorte on

November 15, 2019 at a restaurant in Manhattan, that they went on their first date the very next

day, and that it did not take long before they decided that they wanted to spend their lives

together and started planning accordingly.  *Id.* ¶ 4.  She recounts that on the evening of the day

De Goorte's bail was revoked, January 30, 2020, De Goorte's then-counsel Schiff responded to

her question regarding the fastest way to get De Goorte home to Dickerson was for him to take a

plea, move quickly to sentencing, and fight for a sentence of time served; Dickerson states that

Schiff did not mention that the charges against De Goorte would lead to his deportation and

make him permanently ineligible for United States citizenship.  *Id.* ¶ 6.  Dickerson states that

Schiff encouraged her and De Goorte to hire an immigration attorney and pursue efforts to get a

green card and become a citizen after Dickerson told Schiff (following De Goorte's release on

bail) that it was their plan for De Goorte to apply for a green card and ultimately to become a

U.S. citizen.  *Id.* ¶¶ 9–10.  Dickerson and De Goorte were married in July 2020 and hired an

immigration attorney in August 2020.  *Id.* ¶¶ 10–11.  In October 2020, with the assistance of

counsel, Dickerson and De Goorte completed an I-130 form, an I-765 application, and an I-465

application; De Goorte received his employment authorization on July 30, 2021 and the I-130

was granted on November 17, 2021.  *Id.* ¶¶ 11, 13.  In early June 2021, however, Dickerson and

De Goorte learned that De Goorte had been ordered to serve his sentence at a prison in Michigan

that was specifically for immigrants and were told by the immigration attorney that De Goorte

would be deported at the end of his two-year sentence.  *Id.* ¶ 14.  Both were shocked because they believed that they were on the road to securing legal status for De Goorte.  *Id.*

**IV.    The Schiff Affirmation**

The Government has submitted an affirmation from Schiff dated June 13, 2022.  Dkt. No. 128-1.  He disagrees with De Goorte on certain important points and agrees with him on other points.  He states that when, on August 9, 2019, De Goorte asked Schiff to represent him in the criminal case, he learned that De Goorte was present in the United States on a G-4 diplomatic visa.  *Id.* ¶ 2.  Contrary to De Goorte's declaration, Schiff states that he advised De Goorte that he should consult with an immigration attorney—advice he gives all similarly situated clients. *Id.*  De Goorte responded that he was legally permitted to stay in the United States and that his visa did not have an expiration date.  *Id.*

Schiff also states that De Goorte did not express any concern about immigration consequences when the two first met.  *Id.* ¶ 3.  He also states that at their first meeting, he reviewed all of De Goorte's immigration documentation and observed that his visa appeared to have expired.  *Id.*  De Goorte stated that his type of visa did not expire and he had not overextended his permission to remain in the United States.  *Id.*  Again, contrary to De Goorte's declaration, Schiff states that he repeated his suggestion that De Goorte consult with an immigration attorney.  *Id.* ¶ 4.

Schiff agrees with De Goorte in part on certain conversations regarding the plea agreement but puts those conversations in a different light.  He states that De Goorte expressed concern regarding the immigration portion of the plea agreement, stating that he believed it was specifically tailored to him because the Assistant United States Attorney ("AUSA") and the Judge were trying to have him deported.  *Id.* ¶ 7.  Schiff disabused him of that notion.  Schiff stated that the language was standard and included in every plea agreement and not specifically

inserted in De Goorte's agreement.  *Id.*  He also explained that neither the AUSA nor the Judge was trying to have him deported.  *Id.*

Schiff states that he never told De Goorte to ignore the immigration warnings in the plea agreement.  *Id.* ¶ 8.  He told De Goorte that if he was sentenced as an undocumented individual, he likely would get deported and that his best chance of avoiding deportation was either to change his status or, that if he were to receive a non-incarceratory sentence, he would have a better chance of avoiding deportation.  *Id.*  He explained that in his experience in New York, deportation typically occurs when a detainer is attached to an incarcerated individual rather than through immigration officers actively seeking undocumented convicted felons.  *Id.*  Schiff caveated that statement with a story of an undocumented person who delivered pizza to an army base in Brooklyn and was detained by immigration enforcement officers and mentioned that the Presidency of Donald Trump was not good for undocumented individuals, even in "the liberal state of New York."  *Id.*

Schiff states that he never told De Goorte not to be concerned about the Court's immigration warnings at the change of plea hearing.  *Id.* ¶ 14.  In preparing De Goorte for the hearing, he explained that the immigration warnings were not specifically tailored to De Goorte or to his case as De Goorte still believed that the Government and the Judge were trying to remove him from the United States.  *Id.*

Schiff elaborates on the defense strategy.  After the superseding indictment was returned and De Goorte was remanded, the two reviewed the evidence and what a trial would look like for him and agreed that the best strategy would be to argue for a sentence of time served "as the evidence against him was strong and plentiful and difficult to overcome."  *Id.* ¶ 11.  They discussed that the longer De Goorte remained in jail, "the greater his chances of receiving a time-

served sentence," to the point where when De Goorte and his fiancé urged him to make an emergency bail application during the pandemic, he advised that it was in De Goorte's interest to remain in jail as long as possible in order to increase his chances of receiving a time-served sentence. *Id.* The defense strategy was to convince the Court that De Goorte should not serve additional time and, in order to achieve that goal, the defense needed to convince the Government to dismiss the identity theft count which carried the two-year mandatory minimum sentence. *Id.* ¶ 13. Counsel never asked for a deferred prosecution agreement or a plea to a misdemeanor because "there wasn't a snowball's chance in hell of convincing the Government to either," given the strength of the evidence. *Id.*

Schiff states that the Court was well aware of De Goorte's immigration status from the multiple occasions on which Schiff informed the Court that De Goorte did not have legal status—in bail submissions, during bail arguments, and in several letters to the Court. *Id.* ¶ 16. He asserts that his sentencing submission was not focused on what he perceived to be "the obvious issues and arguments the Court hears in every case," but on what he believed was critical to convince the Court to impose a sentence of time served: (a) De Goorte's offense was simple and foolish and lacked complexity; (b) there was a significant disparity between the intended loss and the actual loss demonstrating that De Goorte lacked intent to cause any individual significant harm; and (c) De Goorte suffered greatly in prison partially due to the pandemic. *Id.*

Schiff admits that he quoted De Goorte a fee of $25,000 to try his case but denies that he advised against a public defender. *Id.* ¶ 6. He states that he advised De Goorte that a public defender would be appointed if De Goorte had insufficient means to pay the quoted fee and that the Southern District of New York had some of the best public defenders in the country who

were better than a lot of private attorneys, but that De Goorte was adamant that he did not trust public defenders, believed he would not receive adequate representation from a public defender, and was always dismissive of the option of having a public defender represent him.  *Id.*

Schiff states that through his many discussions with De Goorte regarding options and strategies, De Goorte's "primary concern was to avoid serving further time in prison, not deportation or immigration consequences."  *Id.* ¶ 10.  "Rarely if ever did Mr. De Goorte mention the prospect of deportation or the impact removal would have on him and/or his family.  His concern was always about avoiding jail so that he could continue his efforts to get his business running."  *Id.*  Schiff states that it was not until after they received De Goorte's facility designation after sentencing that deportation became a primary concern.  *Id.*  Schiff states that after De Goorte received the designation letter, it was he who told De Goorte that that his only option to avoid deportation would be to proceed with a Section 2255 motion to vacate based on ineffective assistance of counsel.  *Id.* ¶¶ 19–20.  When De Goorte told Schiff that he would never accuse Schiff of ineffective assistance and wanted another option, Schiff reiterated that a motion claiming ineffective assistance was the only option he knew of and that he would not be personally offended.  *Id.* ¶ 20.  He stated that the Southern District of New York Federal Defenders were "very talented attorneys and that he would be in good hands."  *Id.*

As to his knowledge of immigration law, Schiff states that it is and has been his understanding that an undocumented individual convicted of an aggravated felony can still avoid deportation, although it is unlikely, and in rare cases one can even adjust their status.  *Id.* ¶ 17.  He recalls from a continuing legal education program on the subject of immigration that an undocumented individual can adjust his status "through an asylum claim or if there is a legitimate fear of torture" and also that there is a "possibility of getting a waiver through a

documented, close family member," although those are rare exceptions and not the rule.  *Id.* ¶ 17.
Since he does not purport to be an expert in immigration law, he always recommends to his
clients who are not citizens that they consult with an immigration lawyer.  *Id.*

## V.    The Hearing

Three witnesses testified at the evidentiary hearing on De Goorte's Section 2255 motion:
De Goorte, Dickerson, and Schiff.  Their testimony largely tracked the statements in their
declarations and is detailed below.

### A.    De Goorte

De Goorte testified that he came to the United States from Egypt in 2005 on a diplomatic
visa in connection with an internship at the United Nations.  Hearing Tr. (Sept. 13, 2022) ("Tr.")
at 4, 7.  He has lived in the same apartment for the past 17 years.  *Id.* at 8:9–12.  He is not a
United States citizen; he is a citizen of Egypt.  *Id.* at 27.  His four siblings and his mother all live
in Egypt; his father is deceased.  *Id.* at 9, 32.  He does not own property in the United States and
has just one cousin in the United States, to whom he talks on occasion and on holidays.  *Id.* at 32.

After initially being represented by the Federal Defenders of New York, De Goorte
retained Schiff to represent him after an internet search of lawyers and after Schiff agreed to take
the case up to the time of trial for a flat fee of $30,000.  *Id.* at 10–12.

De Goorte testified consistent with his declaration that he first met Dickerson in
November 2019 at a bar in a restaurant and that they started dating immediately thereafter.  *Id.* at
15–16.

In January 2020, Schiff brought the Government's written plea offer to De Goorte and
told him that he would have to make a decision about the plea as soon as possible.  *Id.* at 18–19.
He was concerned about the Sentencing Guidelines calculation set forth in the agreement and
about the provision regarding immigration.  *Id.* at 18.  During the conversation, Schiff told

De Goorte that the language regarding immigration was the "formal, standard language that exists in every plea."  *Id.* at 18.  After De Goorte spoke to Schiff, De Goorte did not expect that he would definitely be detained.  *Id.* at 19.

De Goorte testified that Schiff never told him that the crimes charged in the indictment constituted crimes involving moral turpitude under immigration law or were aggravated felonies. *Id.* at 20:9–12.  According to De Goorte, Schiff also never said that an aggravated felony makes deportation mandatory.  *Id.* at 20.

De Goorte testified that if he had known that being convicted of the crimes charged in the indictment would make him permanently ineligible for U.S. citizenship and would have made his deportation mandatory, he would have gone to trial.  *Id.* at 21–22.

With respect to the plea hearing, De Goorte testified that Schiff told him that by law the judge would have to repeat everything that was contained in the plea agreement and that the recitation was just standard procedure.  *Id.* at 21–22.

De Goorte testified that he has become conversationally fluent in English, that he is able to read most of what he sees written and is able to say most of the things he wants to say, and that he is able to carry on a relationship with his wife in English; however, he noted that he does not understand everything that he sees and hears in English and sometimes needs translation.  *Id.* at 6–7, 34.  At the same time, he admitted that he appeared before the Court numerous times in connection with the case and never requested an interpreter.  *Id.* at 34–35.  The Court finds that the suggestion that De Goorte did not understand either the plea agreement or the colloquy at the plea hearing is not persuasive.  Schiff, De Goorte's lawyer, testified convincingly that De Goorte had a "fine understanding and comprehension of the English language" and that when he did not

understand something, he said so.  *Id.* at 126–127, 193.  Schiff also testified that De Goorte "had no difficulty communicating."  *Id.* at 140, 194.[1]

Finally, De Goorte testified on direct examination that life for him were he to return to Egypt would be "living hell" and "would be extremely hard" on Dickerson because Christian women in Egypt cannot work and have no income.  *Id.* at 24.  He testified that currently there is a complete lack of freedom and expression in Egypt and that any criticism of the government could put you in jail.  *Id.* at 9–10.

On cross-examination, De Goorte admitted being advised during his plea hearing that there could be adverse effects on his immigration status as a result of his guilty plea and that the adverse effects could include further detention following completion of his sentence and removal or deportation from the United States, *id.* at 45.  However, he stated that he did not understand that the Court's warning that the guilty plea and conviction made it very likely that his removal would be presumptively mandatory, and that he simply answered yes based on his lawyer's advice, *id.* 45.  When asked questions about his understanding of the bail hearing, he repeated the mantra "I answered questions based on my private attorney's advice."  *Id.* at 47.

De Goorte testified that Schiff met with him at the MCC to discuss the plea agreement before he pled guilty and walked him through the agreement, including the paragraph regarding immigration consequences.  *Id.* at 49–50.  He testified, however, that Schiff told him that the paragraph was "legal standard language" that would appear in every plea agreement.  *Id.* at 50.

---

[1] Schiff did testify, however, that it is challenging for him and De Goorte to communicate by telephone, during which they cannot see each other's lips and facial expressions and that, as a result of De Goorte's accent, he had to repeat almost every sentence.  *Id.* at 141–43.  The critical meetings here were all in person.

### B.      Dickerson

Dickerson testified that she is a U.S. citizen and a native of Tennessee, who has lived in New York for six and a half years but most of whose immediate family and friends are in Tennessee. *Id.* at 59–60.  She works in the beauty industry for a company headquartered in Manchester, United Kingdom.  *Id.* at 61.  She first met De Goorte in November 2019 at the bar of a restaurant and went on her first date with him the day after.  *Id.* at 62.  Thereafter, she and De Goorte saw each other "[p]ractically daily."  *Id.* at 64–65.  She moved into De Goorte's apartment in late February or March 2020, *id.* at 70, and married him on July 16, 2020, *id.* at 71. She testified that De Goorte told her early in the relationship that he was facing criminal charges but that he did not seem concerned that the charges could lead to his removal from the United States.  *Id.* at 67.  After De Goorte's bail was revoked, she went to Schiff's office to retrieve his belongings and asked Schiff the fastest way to get him to come home; Schiff responded that the fastest way for him to come home would be to take a plea.  *Id.* at 68–69.  Dickerson testified that Schiff discussed the plea with her and expressed that he knew that De Goorte wanted to remain in the United States.  *Id.* at 69.  She also testified that De Goorte did not tell her that pleading to the charges in the plea agreement would make De Goorte permanently ineligible for U.S. citizenship or that his plea would ensure his deportation.  *Id.* at 70.

According to Dickerson, Schiff encouraged her to get married to De Goorte and, after they were married, encouraged the two to seek out an immigration attorney to seek a marriage petition.  *Id.* at 71.  She and De Goorte spend over $11,000 on an immigration attorney, which she believed did not include the filing fees for their immigration papers; but she was not aware that De Goorte's conviction posed a significant or insurmountable barrier to the success of those applications.  *Id.* at 72.  During the progress of the immigration case, Schiff did not tell her that De Goorte might be removed from the country directly from prison.  *Id.* at 74.  She first learned

that De Goorte would be deported after he was designated to a facility in Michigan from which prisoners are removed from the United States.  *Id*.

On direct examination, Dickerson testified that if De Goorte was removed to Egypt, she would not go with him because she does not speak the language, "the actual conditions in Egypt aren't great," it is not "optimal" for a Christian woman, and if she moved to Egypt she would not be able to be in touch with her family because she was not sure the annual salary she might receive there would be sufficient for her to buy a single plane ticket.  *Id.* at 75.

On cross-examination, Dickerson admitted that she was not at the meeting where Schiff and De Goorte discussed whether he should plead guilty and did not know what Schiff told De Goorte about the immigration consequences of his plea.  *Id.* at 83.  She also testified that she did not have a meaningful chance to discuss the plea with De Goorte before he pleaded guilty and that she did not understand the details of the plea agreement.  *Id.*  She testified that she was not even aware that an actual in-person plea hearing had been scheduled.  *Id.* at 83–84.  She did not talk to De Goorte or to Schiff about the warnings about immigration consequences at that plea hearing and she does not know what De Goorte and Schiff said to each other at the plea hearing. *Id.* at 84.  She further admitted that she never asked Schiff about the immigration consequences before the plea.  *Id.* at 84–85.  She then testified that before De Goorte pleaded guilty, she wanted him to do whatever he needed to do to minimize his jail time.  *Id.* at 85.  While she also volunteered that Schiff told her that he understood that staying in the United States was a priority for De Goorte, *id.* at 85, the Court does not find that testimony to be particularly credible or meaningful for reasons to be discussed later.

### C.    Schiff

Schiff also testified at the hearing.  He is self-employed as a lawyer at his own law firm and has practiced criminal law for 21 years since 2001.  *Id.* at 91.  Before he became a criminal

defense attorney, he was a prosecutor in the New York County District Attorney's Office for ten years.  *Id.* at 91.  He has represented hundreds of clients in matters ranging from petit larceny to attempted murder and has assisted hundreds of clients in resolving a case through a plea agreement.  *Id.* at 91–92.  Many of those clients were non-U.S. citizens.  *Id.*  Probably a hundred of his clients have been individuals who faced immigration consequences in connection with their cases.  *Id.*  He has entered his appearance in about 14 federal cases in New York.  *Id.* at 185.  He also has experience litigating claims of defendants who have alleged that they received ineffective assistance of counsel in connection with the advice they received on immigration issues.  *Id.* at 92–93.  His practice for educating clients regarding plea offers is to review the proposed plea agreement with the client line-by-line to ensure that the client understands what the agreement is and then to discuss the pros and cons of accepting the plea including whether there is an opportunity to negotiate to receive a better offer or whether to take the case to trial, and, if the client is not a U.S. citizen, to explain to him the ramifications of a plea.  *Id.* at 93–94.  In addition, at the first meeting with a client who is not a citizen, Schiff advises the client to consult with an immigration attorney during the course of the case.  *Id.* at 94, 136.  Schiff also testified to his understanding of the immigration consequences of an aggravated felony plea— that deportation is the likely result and deportation is the standard, *id.* at 94:8–10, but that there are certain circumstances in which a non-citizen who has pleaded guilty to an aggravated felony can still avoid deportation, *id.* at 108, including, for example, circumstances in which the defendant is facing deportation to a "dictator in a cruel regime," *id.* at 180:17–19, or, as more fully described below, the defendant is at liberty and not incarcerated, even if he is subject to deportation.  *Id.* at 159–60.

Schiff testified that he first agreed to represent De Goorte in August 2019. *Id.* at 94. De Goorte was unable to afford the fees of the lawyer from whom Schiff was renting space and agreed to the lower fee that Schiff was able to offer. *Id.* at 95, 130–31. At their first meeting, De Goorte explained that he was an Egyptian national who had entered the country lawfully on a visa through his work at the United Nations. *Id.* at 95, 135–36. Schiff recommended that De Goorte consult with an immigration attorney because there were likely to be significant immigration consequences in connection with the criminal matter that would impact his status in the United States. *Id.* at 95–96. At their second meeting, Schiff again recommended that De Goorte seek immigration counsel when he provided Schiff his documentation and visa. *Id.* at 105.

The Government raised De Goorte's immigration status at each of two bail hearings in October 2019 and January 2020. *Id.* at 146–47. Schiff discussed immigration with De Goorte in advance of both of those hearings. *Id.* at 147–48. At the time of De Goorte's October 2019 request to modify his conditions of bail, Schiff went over with De Goorte the Government's letter in opposition including that De Goorte was likely to face deportation at the end of his case. *Id.* at 99–100. Schiff's basis for telling the Court in October 2019 that De Goorte was consulting an immigration attorney was that De Goorte had told Schiff that he had done so. *Id.* at 100, 122, 192. In addition, before the January 30, 2020 bail revocation hearing, Schiff had discussed with De Goorte what the Government's arguments would be. *Id.* at 101. Schiff either gave De Goorte a copy of the Government's letters or read them to him and either gave De Goorte a copy of his own letters to the Court or read them to him. *Id.* at 147. Specifically, Schiff testified that in advance of the October hearing, he read De Goorte the Government's papers in opposition to bail. *Id.* at 149.

Schiff testified that he met twice with De Goorte to discuss the Government's plea offer which Schiff received in writing on February 4, 2020. *Id.* at 103, 149. The first meeting lasted approximately two hours. *Id.* at 106. At it, Schiff sat with De Goorte at a table in the MCC and read the plea agreement to De Goorte line by line to make sure he understood it. *Id.* at 103, 105–06. He also outlined for De Goorte what he thought the Government's evidence would be at trial and what his options were regarding a plea or fighting the case at trial. *Id.* at 103. At the conclusion of the first meeting, Schiff was not satisfied that De Goorte understood all of the details of the plea agreement, what they meant and did not understand the process enough to Schiff's satisfaction. *Id.* at 103, 106, 113. "[H]e was confused about the substance of the plea agreement, not the language." *Id.* at 195.

Schiff met with De Goorte a second time a week later and spent a significantly longer time with him—"the majority of the day." *Id.* at 103, 105. He went through the plea agreement again with De Goorte, reading every sentence in the plea agreement to him, *id.* at 114, and then outlined what the Government's evidence would be at trial and what a trial would mean for De Goorte, *id.* at 106.

Schiff testified that never told De Goorte to ignore the immigration warnings in the plea agreement. *Id.* at 125. He also never told De Goorte that he would likely not be removed because New York is a liberal State. *Id.* at 126. Schiff went over with De Goorte the paragraph regarding the immigration consequences of entering a guilty plea at both meetings he had with him. *id.* at 113, 114, and De Goorte was "very concerned" that the Government and the judge were trying to have him deported and understood the agreement in that form, *id.* at 108, 170. According to Schiff, De Goorte was very against being removed and at some point told Schiff that his life was in the United States. *Id.* at 108, 168. Schiff clarified for De Goorte that the

prosecutor and the judge were not trying to have him deported. *Id.* at 108, 171. In particular, he

"responded to Mr. De Goorte's concern about the judge wanting him deported by saying, neither

the judge, nor the government are specifically trying to get you deported." *Id.* at 172. Schiff

also explained to him that deportation was likely but that an individual who was not sentenced to

a term of incarceration or who received a sentence of time-served might not necessarily be

deported because if there was not a detainer holding him inside the jail and he was released into

the community, New York was not in the habit of sending law enforcement authorities door to

door to arrest undocumented individuals. *Id.* at 109, 111–12, 158–59. Schiff further explained

that "this would only be possible if [De Goorte] received a nonincarceratory sentence" and that

even then it was possible he would be arrested and removed. *Id.* at 109. Specifically, Schiff

testified that he advised De Goorte that deportation was the "standard" and the "likely result" of

his guilty plea but that if he received a time-served sentence, deportation was not inevitable and

there was a chance he would not be deported. *Id.* at 117, 155–56.

Schiff advised De Goorte that the plea agreement was his best bet for receiving a non-

incarceratory sentence because the Government's case was extremely strong and there was not

much of a defense. *Id.* at 104. He explained that the strategy was to minimize De Goorte's time

in jail and to argue for time served on the theory that De Goorte's crime was unsophisticated,

that there was no significant harm to individuals, and that he had received enough punishment by

his detention at the MCC. *Id.* at 104–05. Schiff never counseled De Goorte with respect to legal

issues in a way that contradicted the sentence in the plea agreement regarding the immigration

consequences of his plea, and he never told De Goorte to ignore the advice and warnings in the

paragraph on immigration consequences of pleading guilty. *Id.* at 115.

Schiff also testified that at the first meeting between the two of them, De Goorte's main priority was to get "out from under the case" because he did not do anything wrong. *Id.* at 96, 98. At the time De Goorte decided to plead guilty, Schiff testified that "his top concern was further incarceration. He was not, obviously, enjoying his time at MCC, and that was his primary concern." *Id.* at 114. When Schiff explained to De Goorte that he would likely be deported following a guilty plea, De Goorte "was more fixated on the issue of incarceration" which overlapped with the issue of deportation. *Id.* at 117. Although De Goorte was concerned about the immigration consequences of pleading guilty, *id.* 168, Schiff understood that De Goorte agreed to plead guilty because, after reviewing the evidence, the risk of taking the matter to trial exceeded the risk of incarceration and deportation as a result of a plea. *Id.* at 118. According to Schiff, De Goorte's primary concern was going to jail—"that's what he was freaking out about." *Id.* at 168. Specifically, Schiff gave the following testimony:

> Q.    To be clear, what was the primary focus of Mr. De Goorte's decision whether to plead guilty?
>
> A.    The primary focus was to avoid incarceration or further incarceration. Although I would say that the immigration and deportation issue was tied into that, but verbally, in speaking with Mr. De Goorte, it was predominantly about avoiding further incarceration.

*Id.* at 125.

Schiff further testified that he discussed with De Goorte that there would be a hearing in relation to the plea. *Id.* at 115. He did not advise De Goorte to ignore the Court's warnings at the plea hearing or the Court's instructions or advisements about the potential consequences of immigration at the plea hearing, or to lie to the Court. *Id.* at 115–16, 126. Schiff had no concerns that De Goorte did not understand the terms of the plea at the time of the plea hearing. He and De Goorte had gone over the plea "ad nauseum within a week prior to that." *Id.* at 123.

On cross-examination, Schiff admitted that he did not counsel De Goorte that bank fraud and wire fraud are crimes of moral turpitude or that conviction of a crime involving moral turpitude renders the defendant permanently inadmissible. *Id.* at 139–40. He also did not counsel De Goorte that conviction of an aggravated felony leads to mandatory deportation. *Id.* at 139. Although Schiff did not tell De Goorte that a fraud with a loss value exceeding $10,000 was an aggravated felony, he believed that he did tell De Goorte that he was charged with aggravated felonies. *Id.* at 140. He also had a concern that De Goorte, being a nonnative English speaker, might have a harder time understanding the plea agreement. *Id.* at 142. Schiff wrote to the Court on February 7, 2020, expressing the concern that De Goorte's ability to obtain the requisite understanding to enter a plea was "exacerbated by the fact that English" was not his first language and, on that basis, asked that the change-of-plea hearing for that date be cancelled. Dkt. No. 30. He also had the view on February 7, 2020 that the plea "was about to happen way too fast," and that, as a result, if a plea hearing were held on February 7, De Goorte might not have enough time to make a knowing and informed choice. *Id.* at 150, 152. Upon his request, the Court granted Schiff's request for a one-week adjournment, Dkt. No. 30, and Schiff met with De Goorte again for a more extended time the following week, *id.* at 152. After the second meeting, Schiff had no concerns that De Goorte understood the plea agreement. *Id.* at 195–96.

Schiff also testified on cross examination that he did not tell De Goorte that noncitizens, without green cards, who are convicted of aggravated felonies may be placed in expedited administrative removal proceedings without even seeing an immigration judge or that such a person is deemed conclusively deportable and statutorily ineligible for all forms of discretionary relief from removal. *Id.* at 163. He also did not tell De Goorte that conviction of a crime involving moral turpitude would make it extraordinarily challenging to get a waiver through

marriage even if De Goorte was not placed in an expedited administrative removal proceeding or that an aggravated felony is a *per se* bar to an asylum claim.  *Id.* at 163–64.  He told De Goorte that an aggravated felony made him likely deportable.  *Id.* at 164.  Schiff further admitted that he did not tell De Goorte that a green card holder or a permanent resident who was convicted of an aggravated felony can be deported or that a non-incarceratory sentence would not change the fact that deportation is mandatory for persons convicted of a fraud aggravated felony.  *Id.* at 164.  According to Schiff, he told De Goorte that "his chances of not being deported would increase if he received a non-incarceratory sentence of time served," *id.*, and urged De Goorte to speak to an immigration lawyer, *id.* at 165.  Schiff testified that he did not tell De Goorte that it would be nearly impossible for him to work out his visa issue after taking the plea and testified that he felt that marrying Dickerson might solve the deportation issue.  *Id.*  In addition, Schiff testified that he told De Goorte during the meeting on whether to accept the plea offer that immigration issues in general should be better under a Biden presidency.  *Id.*

Schiff testified that he did not negotiate with the Government for a plea to aggravated identity even though it was "familiar" to him that there was an argument that such crime is not an aggravated felony for immigration purposes; he noted, "Mr. De Goorte would certainly not have agreed to anything that involved two years' mandatory prison consecutive to any other counts." *Id.* at 181–82.  He further stated: "I didn't need to discuss that with him.  He was vehemently opposed as—understandably opposed to any further incarceration."  *Id.* at 182.  He also did not ask the Government for a plea deal to misprision of a felony under 18 U.S.C. § 4 or a misdemeanor, or for a deferred prosecution agreement, *id.* at 182, stating "I wasn't going to ask for something . . . that the government would never even consider in my experience," *id.* at 183.

Schiff acknowledged that in addition to De Goorte's primary concern about going to jail, De Goorte was afraid of losing his apartment and was concerned about his business and about being separated from Dickerson.  *Id.* at 168–69.  He also testified that it was not until De Goorte finally received his prison facility designation that it became obvious that deportation was his primary concern.  *Id.* at 170.

Schiff further admitted that when De Goorte told probation during his interview for the presentence report that he intended to continue to live in the United States as a good citizen, he did not interject to say he likely would be deported, *id.* at 174, nor did he mention deportation or immigration consequences in his sentencing submission, *id.* at 174.  He testified that the judge was well aware of De Goorte's immigration status from the many letters he and the Government had previously filed in the case, *id.* at 175, 177, and he wanted to focus his sentencing submission on novel arguments and on how De Goorte's conduct specifically took him "outside the box" as a basis for such an extreme variance, *id.* at 178.

## PROCEDURAL HISTORY

De Goorte's motion to vacate his judgment of conviction was accepted for filing on February 16, 2022.  Dkt. No. 111.  On May 4, 2022, the Court ordered the Government to submit a proper order and waiver of Petitioner's attorney-client privilege.  Dkt. No. 119.[2]  On May 9, 2022, the Court entered an order that De Goorte sign a waiver of the attorney-client privilege sufficient to allow his former counsel to give sworn testimony addressing the allegations of ineffective assistance of counsel.  Dkt. No. 122.  On June 13, 2022, the Government filed a response in opposition to the motion to vacate, attaching the Schiff declaration.  Dkt. No. 128.

---

[2] The case was originally assigned to the Honorable Alison J. Nathan.  It was reassigned to the undersigned on May 5, 2022 upon Judge Nathan's ascension to the United States Court of Appeals for the Second Circuit.

On June 27, 2022, De Goorte filed a response in further support of the motion.  Dkt. No. 129.

On September 13, 2022, the Court held a hearing on the Section 2255 motion.  On September 16,

2022, at the invitation of the Court, the Government and De Goorte each submitted post-hearing

letters.  Dkt. Nos. 134, 135.

## DISCUSSION

Section 2255 of Title 28 provides a prisoner in custody under a sentence imposed by a

federal court the right to move the Court to vacate his judgment of conviction on the ground that

it was imposed in violation of the Constitution or laws of the United States.  28 U.S.C. § 2255.

Among the rights guaranteed to criminal defendants is the right to the "effective assistance of

counsel at critical stages of a criminal proceeding."  *Lafler v. Cooper*, 566 U.S. 156, 165 (2012).

"To demonstrate counsel was constitutionally ineffective, a defendant must show that counsel's

representation 'fell below an objective standard of reasonableness' and that he was prejudiced as

a result."  *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (quoting *Strickland v. Washington*,

466 U.S. 668, 688, 692 (1984)).

"[T]he negotiation of a plea bargain is a critical phase of litigation for purposes of the

Sixth Amendment right to effective assistance of counsel."  *Padilla v. Kentucky*, 559 U.S. 356,

373 (2010).  Because, as the Supreme Court repeatedly has observed "[p]reserving the client's

right to remain in the United States may be more important to the client than any potential jail

sentence," *id.* at 368 (quoting *INS v. St. Cyr*, 533 U.S. 289, 322–23 (2001)); *see also Lee,* 137

S. Ct. at 1968, "counsel must inform her client whether his plea carries a risk of deportation,"

*Padilla*, 559 U.S. at 374.  "[W]here the law clearly dictates that removal is presumptively

mandatory, a defense attorney's failure to advise his client of that fact falls below an objective

standard of reasonableness."  *United States v. Al Halabi*, 633 F. App'x 801, 803 (2d Cir. 2015).

The failure to provide such advice, or the provision of materially incorrect advice, falls below an

objective standard of reasonableness.  *See Lee,* 137 S. Ct. at 1964; *Padilla*, 559 U.S. at 368–71;

*Rodriguez v. United States*, 730 F. App'x 39, 42 (2d Cir. 2018) ("Rodriguez's counsel's 'alleged

advice that she need not worry about immigration consequences . . . [fell] below an objective

standard of reasonableness.'" (citation omitted)); *United States v. Ferrera*, 2020 WL 7342673, at

*2 (S.D.N.Y. Dec. 14, 2020) ("In the immigration context, if defense counsel provides 'false

assurance that [a defendant's] conviction would not result in removal,' the representation is not

objectively reasonable" (citation omitted)).

      To demonstrate prejudice, the movant who has pleaded guilty must demonstrate that

there is "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty

and would have insisted on going to trial."  *Lee*, 137 S. Ct. at 1965 (quoting *Hill v. Lockhart*, 474

U.S. 52, 59 (1985)).  This involves a two-part inquiry.  First, "a petitioner alleging ineffective

assistance based on immigration misadvice must 'clearly demonstrate that he placed particular

emphasis on [immigration consequences] in deciding whether or not to plead guilty.'"  *Doe v.

United States*, 915 F.3d 905, 911 (2d Cir. 2019) (quoting *Kovacs v. United States*, 744 F.3d 44,

52 (2d Cir. 2014)); *see also Rodriguez*, 730 F. App'x at 43 (same).  In this evaluation, courts

"cannot rely solely on 'post hoc assertions from a defendant about how he would have pleaded

but for his attorney's deficiencies'; [they] must also 'look to contemporaneous evidence to

substantiate a defendant's expressed preferences.'"  *Doe*, 915 F.3d at 912 (citing *Lee*, 137 S. Ct.

at 1967; *see also Rodriguez*, 730 F. App'x at 43.  Such contemporaneous evidence includes

whether the defendant raised his immigration concerns with counsel, his history in the United

States, his family circumstances, and any gainful employment in the United States.  *See Lee*, 137

S. Ct. at 1967; *Rodriguez*, 730 F. App'x at 43–44.  Second, the moving party must demonstrate

that "but for counsel's unprofessional errors, there was a reasonable probability that the

petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense." *Kovacs*, 744 F.3d at 52; *see Doe*, 915 F.3d at 911; *Rodriguez*, 730 F. App'x at 43; *see also Ferrera*, 2020 WL 7342673, at *3.

Prejudice is assessed on a "case-by-case" basis upon the "totality of the evidence." *Rodriguez*, 730 F. App'x at 43 (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000) and *Strickland*, 466 U.S. at 695). "Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one," *Lee*, 137 S. Ct. at 1966, but that is not invariably the case: where, for example, the plea that is offered is "similarly dire" to the consequences of a loss after trial, a defendant might rationally reject a plea offer "in favor of throwing a 'Hail Mary' at trial." *Id.* at 1967; *see Doe*, 915 F.3d at 914 ("[E]ven if Doe were likely to lose, it would be far from irrational for Doe to litigate either the entire charge or the loss amount, given his strong interest in remaining in the country."). "As long as a court is persuaded that the petitioner would have gone for the longshot, however unlikely it was to succeed, this prong of the inquiry is met." *Ferrera*, 2020 WL 7342673, at *5.

De Goorte has shown neither that counsel's advice fell below an objective standard of reasonableness nor that he was prejudiced by counsel's advice. With respect to the first *Strickland* prong, the Court finds that Schiff advised De Goorte and that De Goorte accordingly knew that he likely would be deported following his conviction. That conclusion is supported by Schiff's testimony. Schiff testified and declared that he told De Goorte that deportation was the likely result of his guilty plea. No. 128-1 ¶ 8. He also testified that he told De Goorte that his best chance of avoiding deportation was if he received a sentence of time served and even then it was possible that he would be arrested and removed. Tr. at 109. Although there is no evidence that Schiff stated the words that deportation was presumptively mandatory upon De Goorte's

conviction or told him that noncitizens who are convicted of aggravated felonies are placed in expedited removal proceedings and cannot invoke asylum, the Sixth Amendment does not require counsel to recite those words *in haec verba*.  Counsel may convey the substance.  *See Strickland*, 466 U.S. at 696 ("[I]n adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules"); *Zodhiates v. United States*, 2022 WL 3605957, at *11 (W.D.N.Y. Aug. 23, 2022) ("To allow such a technicality to control Zodhiates's case would hold defense attorneys to a standard that elevates form and legalese over substance in their communication with their clients.").  He also went over the language of the plea agreement that De Goorte's removal from the United States was presumptively mandatory twice, in two separate meetings with De Goorte at the MCC, and never gave De Goorte any advice contrary to that warning.  De Goorte has cited no authority that Schiff was required to tell him that the crimes to which he was pleading guilty involved moral turpitude and that conviction of a crime involving moral turpitude renders the defendant permanently inadmissible.  Schiff believed that he told De Goorte that the crimes of which he was pleading guilty were aggravated felonies, Tr. at 140, and that as a result he was subject to deportation, Dkt. No. 128-1 ¶ 8.  There would have been no confusion from what Schiff stated.

Moreover, that De Goorte was told and understood that his removal from the United States was presumptively mandatory upon his conviction is further corroborated by his guilty plea and by all of the circumstantial evidence in the case.  At the guilty plea hearing, De Goorte was specifically questioned about his understanding of the impact of a guilty plea and he confirmed that he understood both that there may be adverse effects on his immigration status including detention following completion of his sentence and removal or deportation from the United States and that his guilty plea and conviction made it very likely that his removal from

the United States was presumptively mandatory.  Dkt. No. 36 at 14:6–15:2.  He now effectively disavows those statements.  But it is more credible that he was telling the truth when, at the guilty plea hearing and under oath, he stated that he understood the consequences of the guilty plea than it is that he is telling the truth now, after his argument for time served has been rejected and he is faced with removal.

Furthermore, that removal was presumptively mandatory would not have come as a surprise to De Goorte.  It was a feature of the Government's bail arguments, both when it successfully resisted De Goorte's motion to be relieved from the condition of GPS monitoring and when it successfully moved for De Goorte's remand.  Dkt. Nos. 22, 34 at 13:9–14.  In both instances, the Government stated, and De Goorte was told, that it was likely he would be removed from the United States if he was convicted of the crimes charged in the indictment.

De Goorte stated in his declaration that when he was told by the Court that his removal from the United States was "presumptively mandatory," he did not understand that to mean anything different from what he states he had been told by Schiff—*i.e.*, that he "did not actually have to worry about being deported."  Dkt. No. 109-1 ¶ 13.  The Court finds it telling that De Goorte did not actually testify, either through his declaration or at the hearing, that Schiff told him that he did not have to worry about being deported.  Nor did he dispute Schiff's testimony that if De Goorte was sentenced to a term of imprisonment, he would be deported.

In any event, the Court finds De Goorte's testimony, where it conflicts with that of Schiff, not to be credible.  Schiff is an experienced criminal defense lawyer.  He testified forthrightly about what he told De Goorte and what he did not tell De Goorte.  He answered questions directly and responsively.  His testimony was consistent with the documentary and other evidence in the case.

By contrast, De Goorte was not candid and forthcoming; he was evasive.  De Goorte was asked at the evidentiary hearing for the Section 2255 motion whether he heard the Government argue at the October 31, 2019 bail hearing that he was a flight risk because he could have been removed from the United States after he was convicted.  His answer was evasive, repeating the mantra: "I know that you do have evidence against me; nevertheless, I was ready to go to trial." Tr. at 39.  He repeatedly denied that he had told Schiff at the time of the October 31, 2019 hearing that he was consulting with an immigration attorney, *id.* at 39–40; yet, he was present at the October bail hearing when Schiff said exactly that in his presence, and Schiff testified credibly at the evidentiary hearing that he stated that De Goorte was consulting with an immigration attorney at the October bail hearing because De Goorte had told him that he was consulting with an immigration attorney.  De Goorte admitted that he was present for the January bail hearing where, after he was arraigned, the Government moved successfully to revoke his bail.  But when confronted during cross-examination with the evidence that the Government said at the January bail hearing that he would likely be removed from the United States following a federal felony conviction, he once again repeated the mantra: "I know that you have evidence against me, but despite all of this, I was ready to go to trial."  Tr. at 40.

The following excerpt from De Goorte's recross examination is representative:

Q.      Mr. De Goorte, when you appeared in court in October 2019, did the government argue that you would be deported if convicted, yes or no?

A.      I know that you have evidence against me; nevertheless, I was willing to proceed to a trial.

Tr. at 17–21.

The Court does not credit De Goorte's testimony.

De Goorte also argues that the advice that Schiff admits that he gave De Goorte was ineffective and unreasonable.  Schiff told De Goorte that removal was likely but that there was a

possibility that he would not be deported.  De Goorte also argues that he was misled by Schiff's statement that neither the judge nor the Government was trying to get him deported.  The Court cannot find that either comment, understood in context, falls outside the "wide range of reasonable professional assistance" required by *Strickland*, 466 U.S. at 689.  With respect to the former, Schiff's advice was not that De Goorte would be permitted to remain in the United States following his conviction.  He advised De Goorte that if the Government sought to remove De Goorte, he likely would be removed.  This is thus not a case in which counsel gave the client false advice that he "'may' be deported when deportation is mandatory." *Ferrera*, 2020 WL 7342673, at *2 (quoting *Al Halabi*, 633 F. App'x at 803).  The thrust of Schiff's advice was that, as a matter of law, he would be deported as a result of his guilty plea if the Government chose to do so and that the Government would choose to do so if he was sentenced to a term of imprisonment.  It was also that if the strategy he and De Goorte had discussed was successful, and if he was sentenced to time served and not to further imprisonment, the Government might not seek to remove him—even though it could do so.  That strategy and the advice was not inconsistent with the advice that De Goorte's removal was presumptively mandatory.  The strategy and advice were based on the fact, explained to De Goorte, that his removal was presumptively mandatory.

Moreover, the strategy was eminently reasonable and had a possibility of success. De Goorte was charged with serious crimes that gave rise to a lengthy Sentencing Guidelines range, but he had served time in pretrial detention under the challenging circumstances of Covid-19 and the defense had reasonable arguments for a variance.  Had the strategy succeeded, it would have killed two birds with one stone.  First, and most important for De Goorte, *see infra* at pp. 41–43, it would have reduced the amount of time he was incarcerated.  But second, and also

importantly, it would have allowed De Goorte the chance to remain in the United States, albeit on an undocumented basis where (as Schiff explained) he would still be at risk of removal at any time. Unlike if he were sentenced to a term of imprisonment, if he were released into the community, the authorities would have had to arrest him if they wished to remove him.

The second argument—*i.e.*, Schiff's statement that neither the judge nor the Government was trying to get him deported—takes De Goorte's comment out of context. De Goorte had expressed the concern that Judge Nathan and the prosecutor had a motive or interest in having him deported. In short, De Goorte was concerned that the Judge or the prosecutor would take a position with respect to the plea or sentence for the purpose of having him removed from the United States. There was no support for that notion. The job of a prosecutor is to prosecute persons for crimes; it is ICE that is responsible for removal. The job of a federal judge at the time of sentencing in a criminal case is to impose a "sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to satisfy the purposes of sentencing; it is not to enforce the laws regarding removal. There was no evidence that either the Judge or the prosecutor had or would perform a role outside her lane. Schiff's comment that "neither the judge, or the government are specifically trying to get you deported," Tr. at 172, thus was both directly responsive to De Goorte's concern and perfectly appropriate. De Goorte was entitled to know whether, in addition to the immigration authorities, he would have had the prosecutor and the judge to worry about in terms of removing him from the United States. It was not unreasonable for Schiff to answer the question. More to the point, nothing that Schiff said in response to the question would have undermined the advice that upon conviction, removal was the likely result and would follow if De Goorte was sentenced to imprisonment.

In the same vein, De Goorte argues that Schiff provided advice outside the wide range of reasonable professional assistance by stating to him that the language in the plea agreement was "standard" and was found in every plea agreement.  But what Schiff told De Goorte was the truth.  The language is standard and is in every plea agreement.  It was not unreasonable for Schiff to say that, particularly when De Goorte had expressed the concern that the language was drafted just for him.  What Schiff did not say, and what De Goorte could not have understood, was that the language was inapplicable to him.  In fact, Schiff made clear that the language was applicable to De Goorte and that it was likely he would be removed.[3]

De Goorte argues that "an Arabic interpreter would have been necessary to help [him] correctly understand the warnings in the plea agreement and in court against the backdrop of Mr. Schiff's misleading advice."  Dkt. No. 135 at 8.  There is no evidence, however, that De Goorte misunderstood the language of the plea agreement or that an Arabic interpreter would have been necessary for him to properly understand the agreement.  Schiff testified that after the second meeting he had with De Goorte concerning the terms of the plea agreement, he had no concerns

---

[3] De Goorte suggests that Schiff did not understand the immigration consequences of De Goorte's guilty plea because, even after the plea, he advised De Goorte to get married and to consult with immigration counsel.  But Schiff testified credibly on cross-examination that he understood what was necessary about the immigration law.  The fact that, following his conviction, De Goorte married Dickerson was independently relevant to sentencing.  Schiff argued that the Court should take the marriage into account in sentencing De Goorte—that it reflected a "transformation" in De Goorte's life, that "they have a very promising future," and that, as a result of the marriage, De Goorte "had a moral productive member of society there to support and guide him on the right path" and that De Goorte is "in tough good hands."  Dkt. No. 97 at 18–19.  Moreover, De Goorte presents no evidence that such a conviction would have made achieving lawful status through marriage an impossibility.  To the contrary, De Goorte states that such crimes would have made it "*extraordinarily difficult* for him to achieve any kind of lawful status through his marriage to Ms. Dickerson."  Dkt. No. 135 at 4 (emphasis added).  Because marriage may have presented some possibility for De Goorte to change his status (even if that possibility was very remote), it was reasonable for De Goorte's attorney to counsel him to consult an immigration attorney about that possibility.

about De Goorte's understanding of the agreement.  Tr. at 103:15, 195:24–196:2.  During many

of the court proceedings before the evidentiary hearing, De Goorte was asked questions in

English and he responded in English.  *See*, *e.g.*, Dkt. No. 17 at 2:18–3:9; Dkt. No. 97 at 3:19–22,

5:4–23.  He never suggested that he was unable to understand the proceedings.  During the plea

proceedings, Judge Nathan specifically advised him that "[i]f at any point during this process

you don't understand a question that I'm asking you or you want time to consult with Mr. Schiff

for any reason, you let me know and I'll give you as much time as you need."  Dkt. No. 36 at

3:2–6.  De Goorte never asked for time or suggested he did not understand a question.

 The evidence demonstrates that De Goorte understands the English language and that

when he does not understand, he asks a question.

This case is thus far afield from *Ferrera*, *Doe*, and *Rodriguez*, upon which De Goorte

relies.  In *Ferrera*, it was undisputed that counsel falsely told his client, a legal permanent

resident who had pleaded guilty to the aggravated felony of conspiracy to distribute marijuana,

that immigration issues "would 'not be a problem.'"  *Ferrera*, 2020 WL 7342673, at *4.  In *Doe*,

the defense lawyer falsely advised his client that with "cooperation and an ultimate plea of guilty

in [a] nonviolent case, [h]e should not have a problem with the immigration authorities and

should not face deportation."  *Doe*, 915 F.3d at 911.  In both cases, the Government either

conceded or did not dispute that counsel's actions and advice were objectively unreasonable.

Ferrera, 2020 WL 7342673, at *2; *Doe*, 915 F.3d at 910.  Finally, in *Rodriguez*, counsel advised

his client several times before she pleaded guilty to aggravated felonies that she did not have to

worry about the immigration consequences of a plea because she was a United States citizen and

ignored the possibility of denaturalization.  *Rodriguez*, 730 F. App'x at 41–42.  In this case, to

the contrary, defense counsel told De Goorte not only that he was at risk of removal but that it

was likely and then crafted with De Goorte a strategy under which he might avoid the result of being removed.

De Goorte also has not shown prejudice.  He has not shown that he placed "particular emphasis on [immigration consequences] in deciding whether or not to plead guilty."  *Doe*, 915 F.3d at 911 (citation omitted).  To be sure, a defendant's background, his history in the United States, his family circumstances, and his gainful employment all provide important circumstantial evidence supporting the claim that the defendant placed particular emphasis on immigration consequences in deciding to plead guilty.  *See id.* at 912–13 (citing *Lee*, 137 S. Ct. at 1968).  But in this case, those factors do not particularly support De Goorte's claim.  Although De Goorte had been in the United States for nearly fifteen years at the time of his guilty plea and has lived in the same apartment for almost that same amount of time, he owns no property in the United States, has no relatives (other than a cousin who he only speaks to occasionally) in the United States, and has very few close friends in the United States.  His mother and his four siblings all reside in Egypt.  The only gainful and legal employment to which he was able to point prior to his guilty plea was the business—Global Teach—that he was in the process of launching.  But he admitted that his business never operated and that it did not even have an operative website.  Tr. at 55:16–19.  He hired freelancers for the purpose of designing a website. *Id.* at 55:20–22.  He admitted that his closest connection in the United States was to a woman he first met after charges were brought against him in this case, and well after he first moved to the United States, whom he has declared he married on the advice of counsel, and who testified that she would be unwilling to return to Egypt to be with him.[4]

---

[4] *Ferrera* is distinguishable.  By contrast, the criminal defendant in Ferrera was a legal permanent resident of the United States who had fled from Cuba a decade before he pleaded guilty to conspiracy to distribute and who resided in the United States with his wife and son, both

De Goorte has submitted evidence about human rights violations in Egypt, Dkt. No. 109, and testified that he did not want to return to Egypt because there was a "[c]ompete lack or absence of freedom and expression" there and if you "are against the regime you will be detained." Tr. at 9:1–12. But his testimony was entirely general. He offered no evidence that he in particular has any well-founded fear of persecution if he returns to Egypt or that there is any particular reason why he wants to avoid being returned to Egypt other than that he likes the United States better.

De Goorte did state that he told Schiff that one of his objectives was to remain in the United States. Dkt. No. 109-1 ¶ 5. The Court credits the testimony that De Goorte told Schiff that he was very against removal and that his life was in the United States. Tr. at 108, 171. But that remaining in the United States was *a* priority for De Goorte does not establish that it was his *primary* priority. De Goorte was confronted with a difficult decision—accepting a guilty plea that offered the chance of a reduced sentence and potentially even a sentence of time served but the virtual certainty that if he was sentenced to incarceration he would be deported, or taking the risk of a trial which—if he lost—would mean a far lengthier sentence followed by his removal. Despite his present protestations to the contrary, the record evidence and the contemporaneous evidence demonstrate that his primary objective was to reduce the time he would spend in prison and that that objective was more important to him than remaining in the United States. De Goorte had been detained at the MCC. He did not like the experience. He described it as "horrific" and the "worst experience" of his life "ever." Dkt. No. 97 at 34:10–11. He faced a substantial period of certain incarceration if he went to trial and lost, and he wanted to be

---

of whom were United States citizens. 2020 WL 7342673, at *1. The defendant in *Ferrera* also had worked for the same company for the prior eighteen years. *Id.*

incarcerated for the shortest period possible.  That was the focus of the discussions prior to De Goorte taking the plea.  As Schiff testified, De Goorte's primary concern was going to jail, *id.* at 168:15–18, and "[t]he primary focus was to avoid incarceration or further incarceration," *id.* at 125:19–20; *see also* Dkt. No. 128-1 ¶¶ 10, 19–20.  Indeed, he did not hire an immigration lawyer until after his guilty plea.  His wife, Dickerson, did not even ask Schiff any questions about immigration.  Tr. at 84:21–85:6.  It was not until after he received his designation—*i.e.*, after he received the lower sentence that the plea agreement secured for him—that he then expressed that avoiding removal was his primary concern.  Tr. at 170.  The evidence supports that immigration was not the key focus for De Goorte at the time of the plea—it was a nice to have, but not a must-have.[5]

There also is no evidence that "petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense."  *Kovacs*, 744 F.3d at 52. De Goorte's counsel suggests that Schiff was ineffective in not asking the Government to allow De Goorte to plead to misprison of a felony, or to a misdemeanor, or to a deferred prosecution. Tr. at 182:13–24.  But, Schiff credibly and reasonably testified that based on the charges and the evidence there was not a "snowball's chance in hell" that the Government would accept that

---

[5] The Court thus does not credit, or find meaningful, Dickerson's testimony that Schiff told her he understood remaining in the United States was a priority for De Goorte.  Tr. at 85.  Dickerson was not a disinterested witness.  She clearly would like De Goorte to remain in the United States and would favor any result that would make that outcome more likely.  Her testimony regarding what Schiff purportedly told her is conclusory and lacks any details, including what was said and when it was said and is in tension with her testimony that she never discussed immigration consequences with Schiff prior to the plea.  Tr. at 84, 85.  Moreover, that Schiff would not tell Dickerson at some point that he understood that avoiding removal was a priority for De Goorte is not entirely surprising.  She was De Goorte's fiancé and then wife.  The testimony does not establish that avoiding removal was *the* priority for De Goorte at the time of his plea or that he would have taken the risk of a longer prison sentence for the chance of remaining in the United States.  In general, the Court does not find Dickerson's testimony to be particularly probative as she was not present for any of the conversations that are critical to the disposition of this motion.

result.  Dkt. No. 128-1 ¶ 13.  Schiff was charged with serious crimes.  *Id.* at 183:16–184:2.  He had committed two significant frauds and then, even after having been charged with those frauds and while on bail, engaged in yet another fraud.  There is no dispute on this record that the Government's evidence was strong.  Although De Goorte repeatedly protested that he was prepared to go to trial, neither he nor his Section 2255 counsel has identified any defense he could have asserted at trial.

The Court also is not persuaded that De Goorte would have gone for the "Hail Mary." *Lee*, 137 S. Ct. at 1967.  De Goorte was confronted with a choice between on the one hand a plea that offered him the prospect of avoiding jail time but the certainty that if he was given jail time he would be removed and, on the other hand, a trial which if he lost would have subjected him to a sentencing guidelines range on Counts One, Three, Four, and Five of 87 to 108 months imprisonment and a mandatory two year consecutive sentence for Count Two to be followed by the certainty of removal.  Presentence Report ¶ 100.  In short, he could have been sentenced to ten years of imprisonment. Schiff offered him a strategy to reduce his risk of a lengthy sentence that also offered him the prospect (albeit remote) that he would not be immediately removed from the United States.  The Court is convinced De Goorte chose the first option, knowing that of the risks of removal.  It is equally convinced that De Goorte would have made the same choice even if his counsel's advice regarding immigration consequences could be deemed unreasonable.

## CONCLUSION

For the reasons discussed above, the motion is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 111.

SO ORDERED.

Dated: September 20, 2022
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge